UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| NATALIE L. FISHER, | ) | CASE NO. 3:15CV879 |
| Plaintiff, | ) ) ) | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| v. | ) ) | |
| CAROLYN W. COLVIN,[1] COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) | <u>MEMORANDUM OPINION & ORDER</u> |
| Defendant. | ) | |

Natalie L. Fisher ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. Plaintiff asserts that the Administrative Law Judge ("ALJ") erred in her residual functional capacity ("RFC") determination when she failed to properly evaluate the weight that she attributed to Plaintiff's treating psychiatrist and she erred in her treatment of the examining and reviewing psychologist opinions. *Id.* For the following reasons, the Court REVERSES the ALJ's decision and REMANDS the instant case for the ALJ to reconsider, reevaluate, and further explain her analysis concerning the opinions of Dr. Ahmed and Dr. Zake.

## I. PROCEDURAL AND FACTUAL HISTORY

Plaintiff filed applications for DIB and SSI on August 11, 2009 and those applications were denied initially on December 15, 2009 with no appeal filed thereafter. She then filed applications for DIB and SSI on February 7, 2012 alleging disability beginning June 2, 2011 due to bipolar disorder, depression, obsessive-compulsive disorder ("OCD") and hepatitis C. ECF Dkt. #11 ("Tr.") at 217-227, 258. The SSA denied Plaintiff's applications initially and on reconsideration. *Id.* at 117-139, 258. Plaintiff requested an administrative hearing, and on November 13, 2013, an ALJ

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security, replacing Michael J. Astrue.

conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id.* at 37, 143-151. On January 21, 2014, the ALJ issued a decision denying DIB and SSI. *Id.* at 19-32. Plaintiff appealed, and on March 6, 2015, the Appeals Council denied review. *Id.* at 1-14.

On May 4, 2015, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On July 27, 2015, the parties consented to the jurisdiction of the undersigned. ECF Dkt. #13. On August 24, 2015, Plaintiff, through counsel, filed a brief on the merits. ECF Dkt. #14. On November 6, 2015, Defendant filed a brief on the merits. ECF Dkt. #17. On November 20, 2015, Plaintiff filed a reply brief. ECF Dkt. #18.

## II. SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

On January 21, 2014, the ALJ issued a decision finding that Plaintiff suffered generalized anxiety disorder, bipolar disorder, depression, OCD, social phobia and opioid dependence in early remission, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Tr. at 21. The ALJ further determined that Plaintiff's impairments, individually and in combination, did not meet or equal any of the Listings. *Id.* at 22-23.

The ALJ proceeded to find that Plaintiff had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple, routine tasks consistent with unskilled work in a static environment with few changes, with no fast pace or strict production quotas; she is able to make simple workplace decisions; and she can maintain superficial interaction with coworkers, supervisors, and the public. Tr. at 23. Based upon this RFC and the testimony of the VE, the ALJ concluded that Plaintiff could return to her past relevant work as a door-to-door salesperson and in the alternative, she could perform jobs existing in significant numbers in the national economy, including the representative occupations of a packer, inspector, and stock clerk. *Id.* at 30-32. Consequently, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and he was not entitled to DIB or SSI. *Id.*

## III. STEPS FOR ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

-2-

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*,

486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V. RELEVANT MEDICAL HISTORY AND TESTIMONY

### A. MEDICAL HISTORY

On June 4, 2009, Plaintiff presented to Compass for a diagnostic assessment after seeking inpatient admission there and to the Methadone Maintenance Program as she was three months pregnant and had been using opiates for at least 10 years. Tr. at 325. She indicated that she was using up to 8 buttons of Dilaudid daily and she knew that it exacerbated her mood disorders, but she could not stop using. *Id*. at 328. She was homeless at the time and sought to end her drug dependence and lead a normal life. *Id*. She reported that she was divorced from her fourth husband who was trying to collect child support from her and she had two children, one of whom lived with her brother and the other lived with the child's father. *Id*. She indicated that she had a bachelor's degree in nursing and she last worked in 2006. *Id*. at 326. She reported that she was diagnosed with depression or bipolar disorder in the past and she had racing thoughts, did not feel right, felt like she could not focus and she described "weird" thoughts and compulsive behavior, such as positioning her feet off the floor when she heard certain songs, and opening and closing doors several times a day for no reason. *Id*. at 327. She explained that if she did not perform some of these rituals, someone would die, such as when she did not pray one day, her grandmother died. *Id.* She also reported seeing shadows. *Id.* She was diagnosed with bipolar II disorder, OCD, and opioid dependence, and she was admitted to the Methadone Maintenance Program, the Short Term Residential Program at Compass, and she was given a caseworker and linked to AA/NA, community mental health services and community transitional housing. *Id*. at 332. On August 27, 2009,

Plaintiff was discharged from the Short Term Residential Program after making progress on her goals as she improved her physical, mental, emotional health, obtained a sponsor and completed the treatment program. *Id*. at 334.

On August 23, 2011, Plaintiff sought mental health treatment upon release from Compass while she was continuing her sober treatment program. Tr. at 378. She requested linkage to Unison Behavioral Healthcare ("UBH"). *Id*. She was diagnosed with bipolar disorder, not otherwise specified, and opioid dependence. *Id.* at 379.

On September 26, 2011, Plaintiff presented to Dr. Ahmed at UBH for a medication continuation appointment. Tr. at 370. She reported that she was living in a family house shelter with her boyfriend and three children, she had been seen by another doctor for her mood swings, and she was prescribed Seroquel regular and Seroquel XR. *Id*. She indicated that Seroquel was working for her as she was feeling more stable. *Id*. Upon examination, Dr. Ahmed found that Plaintiff was somewhat anxious and stressed out, she had fair eye contact, spontaneous speech, an anxious and dysphoric mood, no psychosis, and fair insight and judgment. *Id*. He continued the Seroquel and added another 200 mg at bedtime. *Id*.

On November 21, 2011, Plaintiff presented to Dr. Ahmed for an initial psychiatric evaluation. Tr. at 346. Plaintiff related that she was in a relationship with the father of two of her children and one of the children lived with her mother and the other lived with her in a shelter with her boyfriend. *Id.* She reported that she had another child from a prior marriage. *Id.* She noted that she was unemployed, but used to be a nurse, and she last worked at Bob Evans, but was fired because she talked too fast. *Id*.

Plaintiff related to Dr. Ahmed that she needed to be placed back on her medications because she had problems. Tr. at 346. Plaintiff's long history of mood disorder and opiate dependence was noted, and Dr. Ahmed also noted that he examined Plaintiff in September for medication continuation where he continued her on Seroquel for mood swings and stabilization. *Id.* He reported that she had missed her appointment with the nurse and was therefore off of her medication for the last two to three weeks so she was feeling irritable and moody. *Id*.

Plaintiff also reported that she felt depressed and had mood swings since she could remember, including an instance where she was suicidal at the age of 15 and pulled out a knife and threatened her life and ended up in the hospital. Tr. at 346. She was treated with Haldol and Cogentin. *Id*. She explained that she was hospitalized for a month, and hospitalized again at age 16 where she was started on Lithium, and then Depakote. *Id*. She also was treated with Zyprexa and Prozac, and she found that Prozac was helpful. *Id*. She described phases of bursts of energy with a decreased need for sleep, increased talking, distraction, and problems with concentration, followed by depressive times, which last longer than her upswings. *Id*. She also noted anxiety attacks. *Id*. at 347.

Plaintiff related that her grandmother raised her as her mother was an alcoholic and her dad was not in her life. Tr. at 347. She dropped out of school in ninth grade as she felt paranoid while in school and she then returned to get her GED and later her nursing degree. *Id*. She was a charge nurse at a nursing home for many years, but she had a "breakdown" in 2004 after her brother and her grandmother died. *Id*. She was trying to either go back to school to pursue social work or she was going to try to get her nursing license reinstated. *Id*. She explained that she had been to jail twice, once for taking $42 which somehow ended up being a felony, and another for child endangerment after she was found high in a parked car with a baby. *Id*. Plaintiff also reported that she started opiates at age 30 by taking Vicodin and Percocet, and later was doing IV heroin. *Id*. at 348. She reported that she was sober when she went to Compass, but then relapsed and then became sober again. *Id*.

Upon examination, Dr. Ahmed found that Plaintiff was anxious and tense, but cooperative and interactive, she was very fidgety and restless, with pressured speech, irritable mood and congruent affect. Tr. at 348. He found no symptoms of psychosis and found her memory intact, her intellect to be average and her insight and judgment to be fair. *Id*. He rated Plaintiff's global assessment of functioning at 45, indicative of serious symptoms, and he diagnosed Plaintiff with bipolar disorder, not otherwise specified, opiate dependence, marijuana abuse, cocaine abuse, anxiety disorder, not otherwise specified, and rule out panic disorder, without agoraphobia. *Id.* at

348-349. Dr. Ahmed resumed Plaintiff's Seroquel, added Prozac and encouraged continuing treatment and counseling. *Id*. at 349.

Plaintiff presented to Dr. Ahmed on January 12, 2012 and was stressed out and anxious. Tr. at 367. She reported that the requirements of Job and Family Services were stressful as they were cutting her welfare benefits because they asked her to work 35 hours per week but she could not because she had to attend meetings for her drug use and it was hard for her to keep up with everything. *Id*. She had moved into her own apartment and out of the shelter and was taking her medications regularly with no side effects. *Id*. Dr. Ahmed noted that Plaintiff had fair eye contact, spontaneous speech, dysphoric mood, no psychosis, and fair insight and judgment. *Id*. He diagnosed bipolar disorder not otherwise specified and opiate dependence. *Id*. He increased her Prozac and continued the Seroquel. *Id*.

Plaintiff presented to Dr. Ahmed on January 31, 2012 looking very stressed out and irritable. Tr. at 365. Plaintiff complained of having a lot of problems with OCD and having to perform rituals. *Id.* Dr. Ahmed indicated that Plaintiff told him that she had been performing these rituals since she was young, but she had not brought it up to him before. *Id.* Plaintiff explained that she had to count clothes before she put them in the dryer, like she did when she was young, or someone would die. *Id*. She also explained that whenever music is turned on, she has to raise her feet up from the ground. *Id*. She indicated that she was becoming more frustrated by having to perform these rituals and she was less functional, which stressed her. *Id*. Plaintiff otherwise reported that her mood was getting better and sometimes she skipped the Seroquel, but was sleeping well. *Id*. Dr. Ahmed noted that Plaintiff had fair eye contact, spontaneous speech, dysphoric mood, no psychosis, and fair insight and judgment. *Id*. He increased Prozac and referred her to counseling for OCD. *Id*. at 366.

On March 5, 2012, Plaintiff presented to Dr. Ahmed for follow up and she reported that she was in a good mood and was eating and sleeping well. Tr. at 421. She indicated that her mood was stable. *Id.* Dr. Ahmed found her to be alert, oriented and cooperative, with no abnormal movements, spontaneous speech, fair eye contact, an euthymic mood, a congruent affect, intact

memory and fair insight and judgment. *Id*. He diagnosed bipolar disorder not otherwise specified and opioid dependence. *Id*. He continued her other medications. *Id.*

On April 30, 2012, Plaintiff presented to Dr. Ahmed for medication management and she was somewhat stressed out and anxious, but felt that her mood was getting more stable and her sleep was improved. Tr. at 423. Dr. Ahmed found her to be alert, oriented and cooperative, with no abnormal movements, normal speech, an anxious mood, a congruent affect, intact memory and attention and concentration, and she had fair insight and judgment. *Id*. He diagnosed bipolar disorder not otherwise specified and opioid dependence. *Id*. He continued her medications. *Id.*

On June 19, 2012, Plaintiff presented to Dr. Ahmed for a medication management appointment and he found her to be alert, oriented and cooperative, with no abnormal movements, normal speech, an anxious mood, a congruent affect, intact memory and attention and concentration, and she had fair insight and judgment. Tr. at 391. He diagnosed bipolar disorder not otherwise specified and opioid dependence. *Id*. He continued her medications. *Id.*

On August 16, 2012, Plaintiff presented to Dr. Ahmed for medication management and he found that her mood was sad and depressed even though many of her social stressors were resolving. Tr. at 392. He found her to be alert, oriented and cooperative, with no abnormal movements, normal speech, a sad mood, a congruent affect, intact memory and attention and concentration, and she had fair insight and judgment. *Id.* He diagnosed bipolar disorder not otherwise specified and opioid dependence. *Id*. He increased her Prozac and continued Seroquel. *Id.*

Also on August 16, 2012, Dr. Ahmed completed a medical source statement concerning the nature and severity of Plaintiff's mental impairments. Tr. at 385. He opined that Plaintiff could remember, understand and follow directions for simple tasks less than 2/3 of the time. *Id*. He noted that Plaintiff had racing thoughts and could easily be distracted. *Id*. He marked the same for Plaintiff's ability to maintain attention and concentration for two-hour periods of time for the same reasons. *Id.* As to Plaintiff's ability to perform work activities at a reasonable basis, he marked that her symptoms impaired her pace severely and she could not work at a fast or externally imposed pace. *Id.* at 386. He noted that Plaintiff would be more than 25% less productive than an unimpaired worker. *Id.* Dr. Ahmed further marked that Plaintiff would be absent, late or have to

-8-

leave early due to her psychiatric-based symptoms more than three times per month. *Id*. He also indicated that Plaintiff was unable to consistently interact in a manner that is appropriate to customer expectations, and would not be successful in working with the public. *Id*. He further opined that Plaintiff would likely have emotional blowups or outbursts directed to co-workers or supervisors on an average of more than once every other month. *Id.* As to Plaintiff's ability to withstand the stresses and pressures of routine, simple unskilled work, Dr. Ahmed checked the box indicating that Plaintiff was emotionally fragile and the stress of even routine and unskilled or low-skilled work would likely cause her to decompensate. *Id*. at 387. He noted that Plaintiff would likely be successful only in a sheltered environment. *Id.* He wrote that Plaintiff had mood swings and mood lability. *Id*.

On the same date, Dr. Ahmed wrote on a prescription "To Whom it May Concern" and indicated that he was certifying that Plaintiff was under his care and lately she had been stressed out so that she was not ready to work. Tr. at 388. He indicated that she needed to rest and avoid stressful situations. *Id*.

On October 18, 2012, Dr. Ahmed saw Plaintiff for medication management and she was a little anxious and sad. Tr. at 393. She reported feeling depressed and sad, having problems staying asleep and she was nervous and anxious over financial worries. *Id*. Dr. Ahmed found her to be alert, oriented and cooperative, with no abnormal movements, normal speech, a sad and anxious mood, a congruent affect, intact memory and attention and concentration, and she had fair insight and judgment. *Id*. He diagnosed bipolar disorder not otherwise specified and opioid dependence and he discontinued Prozac and added Pristiq, along with an increase in Seroquel. *Id*.

On January 15, 2013, Plaintiff presented to Dr. Ahmed for medication management and she reported feeling anxious with some mood swings, but improved depression and sleeping. Tr. at 395. Dr. Ahmed found her to be alert, oriented and cooperative, with no abnormal movements, normal speech, an anxious mood, a congruent affect, intact memory and attention and concentration, and she had fair insight and judgment. *Id*. He diagnosed bipolar disorder not otherwise specified and opioid dependence. *Id*. He added Neurontin to help with mood stabilization and continued her other medications. *Id.*

-9-

On February 12, 2013, Plaintiff presented to Dr. Ahmed for medication management and he noted that she was stressed out due to her children and relationship issues, as well as financial issues. Tr. at 406. She reported highs and lows and intermittent sleep difficulties. *Id.* Dr. Ahmed found her to be alert, oriented and cooperative, with no abnormal movements, normal speech, an anxious mood, a congruent affect, intact memory and attention and concentration, and she had fair insight and judgment. *Id*. He diagnosed bipolar disorder not otherwise specified and opioid dependence. *Id*. He increased her Seroquel and continued the other medications. *Id.*

On February 20, 2013, Plaintiff presented to Ms. Dowling, MA, PCC at UBH for counseling. Tr. at 396. She found Plaintiff to have an anxious mood, racing thoughts, appropriate affect, with an intact memory, and adequate concentration. *Id.* Plaintiff reported anxiety as her husband was kicked out of the drug treatment program due to a relapse and he spent their money on drugs and alcohol which made her angry. *Id*. 398-405. Plaintiff continued counseling with Ms. Dowling, but canceled several appointments because she was not feeling well and she reported sadness, stress and depression. *Id.* at 414.

Plaintiff presented to Dr. Ahmed on March 12, 2013 for medication follow up and she reported feeling sad, stressed out due to financial issues, and she reported a lack of motivation and depression. Tr. at 407. He found her to be alert, oriented and cooperative, with no abnormal movements, normal speech, a sad mood, a congruent affect, intact memory and attention and concentration, and she had fair insight and judgment. *Id*. He diagnosed bipolar disorder not otherwise specified and opioid dependence. *Id*. He increased her Pristiq and continued her other medications. *Id.*

On April 26, 2013, Plaintiff reported that she was feeling less anxious. Tr. at 415.

On May 7, 2013, Plaintiff presented to Dr. Ahmed for medication management. Tr. at 408. She reported feeling anxious and she indicated that a few weeks ago she was very stressed out and her therapist told her to go the hospital, but she did not go because she had to care for her children. *Id.* She indicated that she had started feeling better and her mood and sleep were improving. *Id.* Dr. Ahmed found her to be alert, oriented and cooperative, with no abnormal movements, normal speech, an anxious mood, a congruent affect, intact memory and attention and concentration, and

-10-

she had fair insight and judgment. *Id*. He diagnosed bipolar disorder not otherwise specified and opioid dependence. *Id*. He adjusted her medications. *Id.*

On June 22, 2013, Plaintiff met with Dr. Ahmed for medication management and she reported feeling anxious, but felt that her focus had improved with Strallera, although she was unable to take it for some time because her insurance did not cover it. Tr. at 410. Plaintiff was stressed out due to a shooting in her neighborhood. *Id*. Dr. Ahmed found her to be alert, oriented and cooperative, with no abnormal movements, normal speech, an anxious mood, a congruent affect, intact memory and attention and concentration, and she had fair insight and judgment. *Id*. He diagnosed bipolar disorder not otherwise specified and opioid dependence. *Id*. He noted that Plaintiff's anxiety was situational and he continued her medications. *Id.*

Plaintiff presented to Dr. Ahmed on July 2, 2013 for medication management and she reported feeling anxious, having trouble paying attention and becoming forgetful. Tr. at 409. She indicated that her mood was stable and she was eating and sleeping well. *Id.* Dr. Ahmed found Plaintiff to be alert, oriented and cooperative, with no abnormal movements, normal speech, an anxious mood, a congruent affect, intact memory and attention and concentration, and she had fair insight and judgment. *Id*. He diagnosed bipolar disorder not otherwise specified and opioid dependence. *Id*. He added Stallera and continued her other medications. *Id.*

Progress notes from Plaintiff's social worker indicated on August 14, 2013, Plaintiff reported that she was stressed and anxious and her husband was not living with them since he was kicked out of the drug program. Tr. at 419.

On October 17, 2013, Dr. Ahmed completed an updated medical source statement concerning the nature and severity of Plaintiff's mental impairments. Tr. at 451. He indicated that Plaintiff's mental limitations had remained the same since August 16, 2012 and her mental impairments persisted despite compliance with treatment. *Id*. He further affirmed that the limitations that he

identified on August 16, 2012 would exist regardless of the use of any substances and Plaintiff continued to have limitations that have lasted or were expected to last for at least 12 months. *Id*.

-11-

On October 17, 2013, Dr. Zake, Ph.D, a psychologist, evaluated Plaintiff for the agency and wrote a disability assessment report. Tr. at 457. Plaintiff reviewed her physical and mental health history with Dr. Zake, including her psychiatric hospitalizations when she was a teenager. *Id.* at 458. She reported that she had no adult psychiatric hospitalizations, but she was receiving mental health services at UBH, seeing a psychiatrist every two months and a caseworker. *Id.* She was in a substance abuse program as she used cocaine and opioids to slow herself down. *Id.* She was five months sober and attended 12-step program twice a week. *Id.*

Dr. Zake observed that Plaintiff tended to ramble and was easily embarrassed about the information disclosed during the evaluation. Tr. at 459. He found her to be adequately cooperative and motivated, with rambling speech, and very pressured conversation, although she had normal articulation. *Id.* He found Plaintiff's mood to be manic, with poor eye contact and a preoccupation with her mental health issues and her children's safety. *Id.* at 459-460. Dr. Zake observed that Plaintiff was alert, but she had poor responsiveness because of her excessive rambling. *Id.* at 460. She could recall events but only after a response time delay. *Id.* She had average to high average cognitive reasoning skills. *Id.*

Dr. Zake concluded that Plaintiff's diagnoses were moderate to severe bipolar I disorder with manic characteristics, moderate social phobia, and opioid dependence, in early full remission. Tr. at 461-462. He found that in terms of a GAF, Plaintiff's symptoms and functional level were "extremely impaired." *Id.* He stated:

> She appears to have moderate to severe symptoms of a bipolar I disorder with manic characteristics. She also appears to have moderate symptoms of a social phobia. It is likely that she would have difficulty carrying out instructions given the variations that she has in her mood. Her pace was extremely pressured. Her persistence appears to depend on her mood. Her excessive rambling interferes with her interpersonal relationships. She becomes easily stressed and anxious. As such, both her symptoms and functional level were rated to be 40.

*Id.* Dr. Zake opined that Plaintiff's prognosis was guarded and he concluded that while she showed adequate understanding and recall, her ability to understand, remember and carry out instructions was dependent upon her mood variations. *Id.* He opined that Plaintiff had adequate concentration, but her pace was extremely pressured and her persistence varied depending upon her mood. *Id.* Dr. Zake further concluded that Plaintiff's excessive rambling would interfere with interpersonal

-12-

relationships with responding appropriately to co-workers and supervisors in a work setting. *Id*. He also opined that Plaintiff would be prone to having increased levels of anxiety and mood fluctuations in responding to work pressures in a work setting. *Id*. at 462.

On November 3, 2013, Dr. Zake completed a medical source statement of Plaintiff's ability to perform mental work-related activities. Tr. at 463-464. He opined that Plaintiff had no limitations in understanding, remembering and executing simple instructions, in understanding and remembering complex instructions, or in making judgments on simple work-related decisions. *Id*. at 463. He found that Plaintiff had mild limitations in interacting with the public and in responding appropriately to usual work situations and to changes in a routine work setting. *Id.* at 463-464. Dr. Zake indicated that Plaintiff had moderate limitations in carrying out complex instructions and marked limitations in interacting appropriately with supervisors and co-workers. *Id*. at 464. As explanations for his limitations, Dr. Zake wrote that Plaintiff described fluctuations in her mood which would interfere with her ability to carry out complex instructions or make judgments. *Id*. at 464. He indicated that Plaintiff presented as manic which would also have a negative impact. *Id.* He also wrote that Plaintiff's mood variations and anxiety around interacting with others would impact her ability to interact with supervisors and co-workers. *Id.* at 464. He also stated that Plaintiff was coping adequately with her opioid dependence given her current treatment. *Id.*

### B.     TESTIMONIAL EVIDENCE

Plaintiff was forty-eight years old at the time of the hearing. Tr. at 43. At the November 13, 2013 hearing before the ALJ, Plaintiff testified that she was cohabitating with her children's father and two of her three minor children. *Id*. at 43-44. She has a case manager who drives her around to appointments as, while she did have a driver's license after the accident, she was not sure if she would drive again, so it must have lapsed. *Id*. at 44. She completed four years of college and was previously self-employed selling candles and other home products and had worked at Bob Evans restaurant. *Id*. at 46-47.

She described a typical day as waking up at 4:00 a.m., drinking coffee, grabbing a cab at 5:20 a.m. to go to the methadone program, returning home at 6:30 a.m., getting her 7 year old daughter up for school at 7:30 a.m., making her breakfast, brushing her hair, and packing her lunch. *Id*. at 48.

Plaintiff's significant other walks their daughter to school and Plaintiff wakes her 3 year old daughter up thereafter and spends the day with her. *Id*. at 48-49. Plaintiff testified that she cleans the house, spends time with friends and family, and goes to the grocery store. *Id*. at 49-51.

Plaintiff testified that she was unable to work because of mental health issues. Tr. at 51. She explained that at her last job, people thought that she was hard to work with but she did not think that she was. *Id*. She indicated that people just tended to pick on her and she was fired from Bob Evans. *Id.* at 52-53. Plaintiff reported that she tried heroin, marijuana and crack in order to try to slow herself down or to self-medicate. *Id.* at 53. She stated that she was now working with Dr. Ahmed, whom she indicated she really liked and has been helping her with medications. *Id*. She was also involved with her church and attending Alcoholic and Narcotic Anonymous meetings. *Id*.

Upon questioning by her attorney, Plaintiff testified that her neighbor helps her with her housework as manic phases cause high energy periods with little sleep that make it difficult to focus and low energy phases cause her to sleep. Tr. at 56-57. She indicated that this happens on a biweekly basis and when she has to sleep, the father of her children and her mother care for the 3 year old. *Id*. at 58. She also related that she had trouble with her thoughts racing and she missed being able to sit down and read a book. *Id*. at 59. She testified that she wanted to get up at the hearing and walk all around as something was pushing her to do so. *Id*. at 60. Counsel noted that Plaintiff was fidgeting at the hearing. *Id*. Plaintiff also indicated that when she went to the grocery store, her case manager went with her. *Id.* at 62. She explained that her case manager went with her in case she had a panic attack or took too long to make a decision as to what to buy. *Id.*

The VE then testified. The ALJ asked the VE to assume a hypothetical individual with the same age, education and background as Plaintiff, who could perform work at all exertional levels, but who had the following restrictions: simple, routine tasks consistent with unskilled work in a static environment with few changes; no fast-paced or strict production quotas; superficial interactions with co-workers, supervisors and the public; and the ability to make only simple work-related decisions. Tr. at 66. The VE responded that the hypothetical individual could not perform Plaintiff's past relevant work but could perform a number of other jobs existing in significant

numbers in the national economy, including the representative jobs of a packer, inspector, or a stock clerk. *Id*. at 66-67.

The ALJ inquired about Plaintiff's racing thoughts and difficulty concentrating, asking the VE what the normal time requirement was to be on task during the workday. Tr. at 68. The VE responded that the rule of thumb was that individuals needed to be on task 85% of the time. *Id*. at 69. The VE testified that if an individual is off task 15% of the time, it would be work preclusive. *Id*. When the ALJ asked the impact of a supervisor having to redirect the hypothetical individual to task, the VE answered that the ability to maintain the job would be impacted if a supervisor had to redirect the hypothetical individual consistently more than a couple of times per day. *Id*.

## VI.  LAW AND ANALYSIS

### A.  OPINIONS OF TREATING PSYCHIATRIST

Plaintiff first alleges that the ALJ committed error in failing to properly evaluate and give good reasons for the weight that she attributed to the opinions of Dr. Ahmed, Plaintiff's treating psychiatrist. ECF Dkt. #14 at 14-21. For the following reasons, the Court agrees.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004). A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544. When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

-15-

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore " 'be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why she rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Commissioner of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. Apr.28, 2010). For example, where an ALJ failed to describe "the objective findings that were at issue or their inconsistency with the treating physician opinions," remand has been ordered. *Barrett v. Astrue*, 2011 WL 6009645, at *6 (E.D.Ky. Dec.1, 2011). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. March 15, 2011) (quoting *Rogers*, 486 F.3d at 243 ).

In *Gayheart v. Commissioner of Social Security*, the Sixth Circuit Court of Appeals emphasized that the social security regulations require that two separate analyses occur when evaluating a treating source's opinion. 710 F.3d 365, 375-377 (6th Cir. 2013). The ALJ must first

-16-

consider whether to give the treating source's opinion controlling weight by determining if it is well-supported by clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. *Id*. Then, when the ALJ decides not to give controlling weight to the opinion, the ALJ moves on to determine the weight that the opinion should receive based on the regulatory factors. *Id*. The Sixth Circuit has also held that if "the ALJ adequately addresses the factors required by *Gayheart* and articulates good reasons for discounting the opinion of a treating source, the Commissioner's decision will not be upset by a failure to strictly follow the *Gayheart* template." *Id.* at *5 (citing *Dyer v. Soc. Sec. Admin*., 568 F. App'x 422, 427–28 (6th Cir.2014) ). However, "the reasons must be supported by the evidence in the record and sufficiently specific to make clear the weight given to the opinion and the reasons for that weight." *Brasseur v. Comm'r of Soc. Sec.*, 525 F. App'x 349, 351 (6th Cir.2013) (citing *Gayheart*, 710 F.3d at 376).

The Court finds that the ALJ's analysis concerning Dr. Ahmed's opinions is lacking. The ALJ indicated that she considered Dr. Ahmed's opinions and gave them "less weight." Tr. at 29. If by "less weight," the ALJ meant that she attributed "less than controlling weight" to Dr. Ahmed's opinions, she failed to adequately explain why she found that Dr. Ahmed's opinions were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and inconsistent "with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544. In addition, the ALJ failed to designate the weight that she actually attributed to the opinions. As found by the Sixth Circuit, the failure to assign a specific weight to a treating physician's opinion constitutes error, as "'[a] finding that a treating source medical opinion ... is not entitled to controlling weight [does] not [mean] that the opinion should be rejected.'" *Cole v. Astrue*, 661 F.3d 931, 938, (6th Cir. 2011), quoting *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399, 408 (6th Cir.2009).

If by "less weight," the ALJ attributed less than controlling weight to Dr. Ahmed's opinions and was determining the weight to actually give the opinions, she was required to balance the factors in 20 C.F.R. § 404.1527 and 416.927 such as the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole and the specialization of Dr. Ahmed. *Wilson*, 378 F.3d at 544. She did not do so in this case.

-17-

In considering Dr. Ahmed's opinions, the ALJ relied upon "the objective record, as discussed above," and Plaintiff's daily living activities of maintaining her household, raising her children, engaging in daily methadone treatment, paying household bills and handling relationship/situational stressors. Tr. at 29. However, besides Plaintiff's daily living activities and Dr. Ahmed's general findings concerning Plaintiff's memory and concentration appearing intact, the ALJ fails to specify the portions of the "objective record" upon which she was relying in the preceding part of her decision to analyze the weight to give to Dr. Ahmed's opinions. Reliance upon Plaintiff's daily living activities alone does not establish that Plaintiff can interact appropriately with others on a sustained basis, especially in light of Dr. Ahmed's opinion that Plaintiff was unable to consistently interact with the public and would have outbursts and emotional blowups at co-workers or supervisors more than once every other month. Tr. at 29, 453; *see Gayheart*, 710 F.3d at 377 (claimant's abilities to visit aunt and uncle, receive visits from neighbor, accompany wife to grocery store once per month does not undermine treating psychiatrist's opinion that claimant was markedly impaired to interact with others on a sustained basis). Dr. Zake, the examining agency psychologist, also opined that Plaintiff would have marked limitations in interacting with co-workers and supervisors in a routine work setting. *Id.* at 464. Plaintiff herself indicated that she had some interpersonal conflicts at work as she testified that people found her hard to work with and a couple of bosses did not like her. *Id.* at 51. Further, Plaintiff testified that her neighbor helps her with the housework, the father of her child walks their child to school, and her case manager accompanies her to the grocery store. *Id*. at 57-58, 62-63. Thus, while she does perform some daily living activities, they are mostly done with the aid of others.

In addition, the ALJ failed to fully explain her decision to discount Dr. Ahmed's opinion that Plaintiff would be more than 25% less productive than an unimpaired worker, she would be absent, late or have to leave early due to her psychiatric-based symptoms more than three times per month, and she would decompensate under the stress of even routine and unskilled or low-skilled work. The ALJ merely relies upon Plaintiff's abilities to maintain her household, raise her children and attend a Methadone program in order to find that she can perform work tasks on a regular and continuous basis. Without further explanation as to why she discounted this portion of Dr. Ahmed's

opinion and how her mental RFC for Plaintiff adequately accommodated these limitations, the Court finds that the ALJ's decision is not supported by substantial evidence.

For these reasons, the Court finds that the ALJ has not sufficiently evaluated Dr. Ahmed's opinions under the treating physician rule and substantial evidence does not support her decision to attribute "less weight" to those opinions, particularly regarding Plaintiff's s ability to interact with others, to be productive, to withstand stress and pressures of daily work activity and to show up for work on a regular basis.

### B.     OPINIONS OF EXAMINING PSYCHOLOGIST

Plaintiff also challenges the ALJ's treatment of the opinions of Dr. Zake, an examining psychologist.  ECF Dkt. #14 at 25-26.  Like Dr. Ahmed, Dr. Zake also opined that Plaintiff's abilities to interact with co-workers and supervisors would be impaired.  Tr. at 465.  In fact, Dr. Zake indicated that Plaintiff's functional level was "extremely impaired."  *Id*.  He also found that Plaintiff's pace was extremely pressured and her persistence depended upon her mood.  *Id.*  He noted that she became easily stressed and anxious and he opined that she would be prone to increased levels of anxiety and mood fluctuations when she was confronted with stress.  *Id*.

While the ALJ indicated that she attributed great weight to Dr. Zake's opinion, she attributed great weight to the opinion only to the extent that it was consistent with the mental RFC that she determined for Plaintiff.  Further, as with Dr. Ahmed's opinions, the ALJ relied primarily upon Plaintiff's abilities to care for her children and to attend Methadone treatment in order to find that Plaintiff could perform the mental RFC that she determined.  Without further explanation, the Court finds that this is insufficient support for the ALJ's treatment of Dr. Zake's opinion and for the ALJ's mental RFC for Plaintiff, particularly with regard to Plaintiff's abilities to interact with others and to withstand the stress and pressures of daily work activity.

### C.     ALJ'S MENTAL RFC DETERMINATION

Plaintiff also makes assertions concerning the ALJ's mental RFC, asserting that the least restrictive medical source opinion concerning her mental RFC was more restrictive than the ALJ's mental RFC for her.  ECF Dkt. #14 at 26-34.  Since the Court reverses and remands this case to the ALJ for reconsideration and more thorough articulation as to her findings regarding the opinions of

Drs. Ahmed and Zake, the issue of Plaintiff's mental RFC will not be addressed because the opinions and RFCs of Drs. Ahmed and Zake may play a role in this redetermination.

## VII.   RECOMMENDATION AND CONCLUSION

Based upon a review of the record, the Statements of Error and the law and analysis provided above, the Court REVERSES the ALJ's decision and REMANDS this case for reconsideration, reevaluation and more thorough articulation by the ALJ of the treating physician rule and the weight given to Dr. Ahmed's opinions and reconsideration and more thorough articulation concerning Dr. Zake's opinion.

DATE: August 24, 2016           */s/George J. Limbert*
                                GEORGE J. LIMBERT
                                UNITED STATES MAGISTRATE JUDGE